IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

ESTATE OF DONALD J. BRUESS,
by DONNY E. BRUESS, JR.,
Administrator,

        Plaintiff,

vs.

BLOUNT INTERNATIONAL, INC.
d/b/a DIXON INDUSTRIES, INC.;
HUSQVARNA U.S. HOLDING INC.
f/k/a HUSQVARNA PROFESSIONAL
OUTDOOR PRODUCTS INC. d/b/a
DIXON INDUSTRIES INC.;
HUSQVARNA CONSUMER
OUTDOOR PRODUCTS, N.A., INC.
f/k/a HUSQVARNA OUTDOOR
PRODUCTS INC. d/b/a DIXON
INDUSTRIES, INC.; and 4520
CORP., INC.,

        Defendants.

No. C09-2055

REPORT AND
RECOMMENDATION

_____

**TABLE OF CONTENTS**

I.    *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   *PROCEDURAL HISTORY* . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.  *RELEVANT FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     *A.*    *Bruess' Expert Witnesses* . . . . . . . . . . . . . . . . . . . . . 4
     *B.*    *Dixon's Expert Witnesses* . . . . . . . . . . . . . . . . . . . . . 5
     *C.*    *Bruess' Rebuttal Experts* . . . . . . . . . . . . . . . . . . . . . 6
     *D.*    *Supplemental Disclosures* . . . . . . . . . . . . . . . . . . . . . 7

IV.  *DISCUSSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
     *A.*    *Motion to Exclude Evidence as Untimely* . . . . . . . . . . . . 9
          *1.*    *Admissibility of Mr. Berry's Testimony Regarding the ROPS*
                 *Exemplar* . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

|   |   | a. | Did Bruess Timely Disclose Berry's Opinions Regarding the Rollover Protective System Fabricated and Tested by Berry? | 10 |
|---|---|---|---|---|
|   |   | b. | Was Bruess' Failure to Timely Disclose Substantially Justified? | 17 |
|   |   | c. | Was Bruess' Failure to Timely Disclose Harmless? | 18 |
|   | 2. |   | Admissibility of Dr. Griffin's Testimony | 21 |
| B. |   |   | Motion to Exclude Expert Evidence Under Daubert | 24 |
|   | 1. |   | Design Defect | 25 |
|   |   | a. | Mr. Berry's Opinion Regarding the Mower's Alleged Defective Design | 25 |
|   |   | (1) | Admissibility of Opinion Without Evidence of ROPS Exemplar | 26 |
|   |   | (2) | Admissibility of Mr. Berry's Opinion with Evidence of ROPS Exemplar Included | 33 |
|   |   | b. | Dr. Ketchman's Opinion Regarding the Mower's Alleged Defective Design | 37 |
|   | 2. |   | Inadequate Warnings | 40 |
|   |   | a. | Dixon's Contention that there is No Evidence Bruess Read the Warnings | 41 |
|   |   | b. | Admissibility of Opinions Regarding Adequacy of Warnings | 42 |

V. RECOMMENDATION ........................................ 46

## I. INTRODUCTION

This matter comes before the Court on the Motion to Exclude Evidence on a ROPS Exemplar and Expert Griffin as Untimely (docket number 28) filed by the Defendants on March 1, 2011; the Response (docket number 33) filed by the Plaintiff on March 30, 2011; and the Reply (docket number 38) filed by the Defendants on April 12, 2011.

Also coming before the Court at this time is the Motion to Exclude Expert Evidence Under *Daubert* (docket number 39) filed by the Defendants on April 20, 2011; the Resistance (docket number 53) filed by the Plaintiff on June 1, 2011; and the Reply (docket number 58) filed by the Defendants on June 20, 2011.

On May 25, 2011, Judge Edward J. McManus entered an Order referring these motions to the undersigned magistrate judge for a report and recommendation. Pursuant to Local Rule 7.c, the issues will be decided without oral argument.

## II. PROCEDURAL HISTORY

On October 22, 2009, Donny E. Bruess, Jr., acting as Administrator of the Estate of Donald J. Bruess, filed a complaint seeking damages for the alleged wrongful death of Donald J. Bruess. (For convenience, the Court will refer to Plaintiff as "Bruess.") Two days later, Bruess filed an amended complaint, changing the names of the corporate defendants found in the caption. The Defendants (collectively "Dixon") filed an answer on December 23, 2009.

On February 12, 2010, the Court adopted a proposed Scheduling Order and Discovery Plan submitted by the parties. The deadlines were twice extended on motions filed by Dixon and Bruess, respectively. The extended discovery deadline expired on March 20, 2011. On April 20, 2011, Dixon timely filed a Motion for Summary Judgment (docket number 41), which is pending before the district court. The trial ready date is August 18, 2011.

## III. RELEVANT FACTS

The facts underlying the instant motions are largely undisputed and may be briefly stated as follows: Donald J. Bruess died on October 24, 2007, when a riding lawn mower he was operating rolled over into a pond, pinning Bruess under the water. While the mower being operated by Bruess cannot be located, it is believed to be a model 5022 ZTR, manufactured by Dixon. In his amended complaint, Bruess alleges, among other things, that the mower was negligently designed and unreasonably dangerous as a consequence of not having a rollover protective system ("ROPS").

## A. Bruess' Expert Witnesses

On October 19, 2010, Bruess timely identified two expert witnesses: Thomas A. Berry and Jeffrey Ketchman.[1] After an extensive review of the "hazard/risk" of a riding lawn mower rolling over, and the types of operator protection which can be employed when a rollover occurs, Berry opines in his report that the zero-turn mower involved in this incident was "defective in design and unreasonably dangerous."[2] Among other things, Berry concluded that "[t]he manufacturer knew or should have known of technically and economically feasible design alternatives that would have significantly reduced the risk without adversely affecting the utility of the machine."[3] Moreover, Berry concluded that "design alternatives" were available for the Dixon zero-turn mower.

> The Dixon 5000 Series should have been provided with a rollover protective structure or rollbar and seat belts that would create an operator protective zone in the event of a tipover and/or rollover accident. The cost of providing a ROPS and seatbelt for the Dixon 5000 Series is estimated to be in the range of $100 if the mounting structure is designed into the frame up and up to $150 if not.

*See* October 15, 2010 letter from Thomas A. Berry (docket number 28-2) at 20.

Bruess also identified Dr. Jeffrey Ketchman as an expert witness. Ketchman opines in his report that "it is highly probable that Mr. Bruess would not have been pinned under the mower and drowned if it had been equipped with a properly designed ROPS."[4] In fact, Ketchman opines that "[i]t is highly probable that he would have escaped even

---

[1] Initially, the deadline for Bruess to identify his expert witnesses was May 19, 2010. The deadline was extended to July 19, 2010, however, and extended a second time to October 19, 2010.

[2] *See* October 15, 2010 letter from Thomas A. Berry (docket number 28-2) at 19.

[3] *Id.*

[4] *See* October 12, 2010 letter from Dr. Jeffrey Ketchman (docket number 28-3) at 5.

without minor injury, by just having been thrust sideways into the water."[5] Ketchman concluded that the riding lawnmower was "defectively designed from the safety standpoint because it lacks operator protection in the event of a roll over, which the manufacturer knew could result in severe injury or death."[6] According to Ketchman, "[f]urnishing a properly designed fixed, or foldable ROPS for the 5022, was technically and economically feasible when the subject [mower] was designed/manufactured."[7]

## B. Dixon's Expert Witnesses

On December 19, 2010, Dixon timely identified four expert witnesses: Clair D. Splittstoesser, Herman P. Christopherson, Kevin Breen, and William Kettlekamp. Splittstoesser was employed by Dixon for more than 20 years, until retiring as vice-president of engineering in 2002.[8] Splittstoesser opined in his report that "[i]n order to add ROPS to the 5022, the entire design would essentially have to be abandoned as the majority of features that made the 5022 a unique design were incompatible with ROPS."[9] According to Splittstoesser, "the 5022 was also a very stable mower with a low center of gravity."[10] Splittstoesser opines that Bruess "should have used extra caution" because the grass was wet, and believes that Bruess was "incapacitated" when the accident occurred, because it does not appear that he attempted to steer away from the edge of the pond.[11]

---

[5] *Id.*

[6] *Id.* at 14.

[7] *Id.* at 15.

[8] Mr. Splittstoesser had previously been designated by Dixon to testify in response to Bruess' request for a Rule 30(b)(6) deposition.

[9] *See* December 17, 2010 report of Clair D. Splittstoesser (docket number 28-5) at 3.

[10] *Id.*

[11] *Id.* at 6.

Dixon also identified Herman P. Christopherson as an expert witness. Christopherson opines in his report that the "accident would not have happened" if "the operator was attentive, alert, observant and operating it in a normal and foreseeable manor [sic]."[12] Christopherson concluded that the mower "was not defectively designed or manufactured and it was not the cause of the accident."[13]

Dixon also served an investigative report prepared by Kevin Breen of Engineering Systems, Inc. ("ESI"). ESI concluded that notwithstanding the lack of a ROPS and a seat belt, the mower was "designed in a manner consistent with current standards, contemporary design strategy and is not defective or unreasonably dangerous."[14] ESI also opines that Bruess appeared to be "in an incapacitated condition" when he entered the water.

### C. Bruess' Rebuttal Experts

On January 18, 2011, Bruess timely served a rebuttal report from his expert, Thomas A. Berry. In a letter dated January 12, 2011, Berry reviews the reports of Mr. Splittstoesser, Mr. Christopherson, and ESI, and makes multiple "comments" on the conclusions reached by Dixon's experts.[15] Dr. Ketchman also responds to Dixon's experts in a letter to Bruess' attorney, dated January 12, 2011.[16]

In addition to the rebuttal comments by Mr. Berry and Dr. Ketchman, Bruess also identified a new expert witness – Dale Griffin. Dr. Griffin is a professor of marketing and consumer behavior at the University of British Columbia. In his report dated January 15,

---

[12] *See* December 16, 2010 report of Herman P. Christopherson (docket number 28-6) at 5.

[13] *Id.*

[14] *See* December 16, 2010 report of ESI (docket number 28-7) at 9.

[15] *See* January 12, 2011 letter from Thomas A. Berry (docket number 28-8).

[16] *See* January 12, 2011 letter from Dr. Jeffrey Ketchman (docket number 28-9).

2011, Griffin "examine[s] why consumers purchase ride-on lawnmower models for home or domestic use that do not offer a Rollover Protective Structure (ROPS) as standard or optional equipment."[17] Griffin concludes that there is an "optimistic bias" which "lead[s] individuals to underestimate the likelihood of negative outcomes and overestimate the likelihood of positive outcomes."[18]

### D. Supplemental Disclosures

On February 23, 2011 – 36 days after the deadline for disclosing rebuttal expert witnesses – Bruess served Dixon with what is entitled "Plaintiff's 2/23/11 Supplemental Disclosures."[19] The "supplemental disclosures" consisted of four photographs of a Dixon model 5020, complete with a ROPS constructed by Bruess' expert, Thomas A. Berry. Five days later, on February 28, 2011, Bruess served Dixon with "Plaintiff's 2/28/11 Supplemental Disclosures."[20] The second supplemental disclosure consisted of a 2-page "Rollover Test Report for the Dixon 5020 ZTR ROPS," together with 18 additional photographs. The report and photographs describe a series of rollover tests performed by Berry on February 23, 2011, using a Dixon 5020 equipped with a ROPS designed and fabricated by him. According to Berry, "[t]he ROPS capably withstood the lateral and rearward rollovers, provided a crush protective zone for the operator and will minimize the likelihood of a complete overturn while providing crush protection to an operator should the tractor/mower roll over onto its top."[21]

In an affidavit filed in resistance to Dixon's instant motion, Mr. Berry describes the circumstances surrounding his fabrication of the ROPS and the subsequent testing.

---

[17] *See* January 15, 2011 report of Dr. Dale Griffin (docket number 28-10) at 1.

[18] *Id.*

[19] *See* docket number 28-12.

[20] *See* docket number 28-13.

[21] *See* Plaintiff's 2/28/11 Supplemental Disclosures (docket number 28-13) at 6.

According to Berry, when he read the reports of Dixon's experts, he "became of [*sic*] aware of Defendants' position that subject Dixon Model 5022 lawn tractor would not support a ROPS."[22] In response to the positions taken by Dixon's experts, Berry located and purchased a Dixon model 5020 on January 3, 2011. Berry was unable to locate a Dixon model 5022 ZTR.[23] According to Berry, the model 5020 is part of Dixon's "5000 Series" and "[t]he frames, weight and overall design appear to be substantially similar with the primary difference being that one utilizes a 22 hp engine and the other a 20 hp engine."[24] According to his affidavit, the model 5020 was delivered to Berry on January 11, 2011.[25]

Mr. Berry states in his affidavit that upon receipt of the model 5020, he began the process of designing and installing a ROPS. The design and manufacturing process took from January 11 until approximately February 11, 2011. Berry states that "[i]t was not possible for me to locate, receive, and properly design and install a certifiable ROPS for the Dixon 5020 by the January 18, 2011, deadline for my rebuttal report in light of the difficulty I had finding an exemplar Dixon ZTR mower."[26] The installation of the ROPS was completed on February 11, 2011, and four photographs of the alternative design were provided to Bruess' attorney on February 14. The rollover testing was conducted on February 23, 2011, and a copy of the rollover test report was provided to Bruess' attorney on February 28, 2011.

---

[22] *See* Affidavit of Thomas A. Berry (docket number 33-7) at 3.

[23] The "50" in the name refers to a 50-inch mowing deck, while the "22" refers to a 22 horsepower engine. The "ZTR" stands for "zero turn radius."

[24] *See* Affidavit of Thomas A. Berry (docket number 33-7) at 3.

[25] In his subsequent deposition, taken on March 8, 2011, Mr. Berry testified that he received the model 5020 on January 7, 2011. *See* Deposition of Thomas Alan Berry (docket number 33-6) at 56:20-22.

[26] *See* Affidavit of Thomas A. Berry (docket number 33-7) at 4.

## IV. DISCUSSION

Dixon has filed two motions regarding the admissibility of testimony by Bruess' experts. In its first motion (docket number 28), Dixon asserts that "all evidence relating to Berry's design, construction, and testing of the ROPS exemplar should be excluded as too late."[27] In addition, Dixon asserts that Dr. Griffin's testimony is not true rebuttal evidence and, therefore, Griffin was not timely disclosed and he should be prohibited from testifying.

In its second motion (docket number 39), Dixon seeks the exclusion of all of Bruess' experts pursuant to the Supreme Court's holding in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Dixon claims that the opinions are unreliable, irrelevant, and inadmissible.

### A. Motion to Exclude Evidence as Untimely

First, Dixon argues that part of Mr. Berry's opinions – specifically, that testimony relating to his fabrication and testing of a rollover protective system – was not timely disclosed and, therefore, should be excluded. In the same motion, Dixon asserts Dr. Griffin's testimony does not respond to or rebut any expert evidence offered by Dixon. Accordingly, Dixon asserts that Griffin's testimony is part of Bruess' case-in-chief and, therefore, his disclosure was not timely.

### 1. Admissibility of Mr. Berry's Testimony Regarding the ROPS Exemplar

In determining whether Bruess should be permitted to elicit testimony from Berry regarding his fabrication of a rollover protective system, and his subsequent testing of that system, the Court must address three questions. First, did the disclosure of Berry's opinions in this regard comply with the applicable rules and the Court's orders? Second, if the opinions were not timely disclosed, was Bruess' failure to comply substantially justified? Third, was the failure to comply harmless?

---

[27] *See* Dixon's Brief (docket number 28-1) at 7.

### a. Did Bruess Timely Disclose Berry's Opinions Regarding the Rollover Protective System Fabricated and Tested by Berry?

FEDERAL RULE OF CIVIL PROCEDURE 26(a)(2)(A) requires a party to disclose the identity of any expert witness it may use at trial. If the expert witness is "retained or specially employed to provide expert testimony in the case," then the disclosure "must be accompanied by a written report – prepared and signed by the witness." *See* Rule 26(a)(2)(B). Among other things, the report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them." *See* Rule 26(a)(2)(B)(i).

The disclosures must also be made timely. *See* FED. R. CIV. P. 26(a)(2)(C) ("A party must make these disclosures at the times and in the sequence that the court orders."). Local Rule 26.b provides that the parties must disclose their expert witnesses in accordance with the requirements of FEDERAL RULE OF CIVIL PROCEDURE 26(a)(2)(A) and (B) "on or before the deadlines for disclosing expert witnesses established by the Rule 16(a) and 26(f) scheduling order and discovery plan." Here, the deadline for Bruess to identify his expert witnesses was extended twice to October 19, 2010.

On the deadline for disclosing expert witnesses, Bruess identified Thomas A. Berry and Jeffrey Ketchman. Dixon concedes that Berry and Ketchman were timely disclosed. In addition, Bruess provided expert witness reports in compliance with Rule 26(a)(2)(B). Dixon asserts, however, that Berry's report did not contain "a complete statement of all opinions the witness will express" – as required by Rule 26(a)(2)(B)(i) – because Berry did not disclose the ROPS exemplar until more than four months later.

In his initial report, dated October 15, 2010, Mr. Berry describes in some detail the risks associated with a riding lawnmower rolling over. Berry then opines that "[t]he operator can be provided substantial protection in the event of a rollover through the

provision of a protective structure known as a ROPS or roll bar."[28] According to Berry, the use of roll bars on lawn tractors dates back to the early 1970s. Berry asserts that the number of manufacturers recognizing "the need for ROPS on zero-turn lawn tractors" continues to increase, identifying 30 manufacturers, including Husqvarna.[29] (However, Berry does not report how many of those manufacturers included a ROP system in 1999, when the mower in this case was apparently manufactured.)

In reaching his conclusions, Mr. Berry reviewed the deposition testimony of Clair Splittstoesser. Berry noted that "Mr. Splittstoesser indicated in his testimony on page 35 that the Model 5022 did not have a frame that was conducive to supporting a ROPS."[30] Berry's reference was to a Rule 30(b)(6) deposition held on July 28, 2010, where Splittstoesser testified:

> Q. Okay. Well – and do you have any reason to doubt that ROPS could not have economically been designed and placed on a machine on the size of this 5022 back in 1999?
>
> A. No. I – I – I honestly believe it would not, because the – one of the main reasons is the machine was not conducive to a roll system. It had a frame that was – would not support a roll system, and it had a – a sub frame above the – the main frame which opened up for convenience for servicing. If we were to put a ROP system on there, whether we deemed it necessary – actually, we would have just discontinued the machine and started with a new one.

See Deposition of Clair Splittstoesser (docket number 28-4), 35:12-36:1.

However, almost immediately after testifying that the model 5022 had a frame which "would not support a roll system," Mr. Splittstoesser admitted that machines of the

---

[28] See October 15, 2010 letter from Thomas A. Berry (docket number 28-2) at 8.

[29] Id. at 10.

[30] Id.

*same size* could have supported a rollover protective system "if somebody wanted to do it," but claimed a ROP system could not be certified at that time.

> Q.  Okay.  And can we agree that a machine of this size could have had a two-post system economically designed for it and installed back in 1999 if somebody wanted to do it?
>
> A.  It's – Yes, I believe it could.  My – my – Our objection at that time was that if we did a ROP system, we'd want it certified.  And there was no –
>
> Q.  Okay.
>
> A.  – way of certifying a two-post system.
>
> Q.  Are you telling this jury that there was no way to certify a two-post system for a riding mower in – a two-post system of ROPS for a riding mower back in 1999?
>
> A.  That's correct.

*See* Deposition of Clair Splittstoesser (docket number 28-4), 37:5-19.  In other words, after testifying that the model 5022 frame would not support a roll system, Splittstoesser testified that machines "of this size" could have had a "two-post system."  After noting Splittstoesser's testimony, Mr. Berry stated in his initial report that "I have designed, tested and certified 2-post ROPS for zero-turn mid-mount mowers before 1999. . . ."[31]

In other words, Mr. Berry knew, when giving his initial opinions, that Mr. Splittstoesser opined that a rollover protective system on this mower was not economically feasible because "the machine was not conducive to a roll system" and the frame "would not support a roll system."  In his initial report, Berry disagreed with that opinion, concluding that "[t]here is no technical reason as to why a ROPS could not be

---

[31] *Id.*

supplied upon the Dixon 5000 Series zero-turn riding mower."[32] In his affidavit submitted in resistance to the instant motion, Berry notes that in his first report he concluded "based upon a reasonable degree of engineering certainty that it was both technologically and economically feasible to manufacture a ROPS for the subject Dixon Model 5022 ZTR."[33]

On December 21, 2010 – approximately two months after providing his expert report – Mr. Berry was provided with copies of Dixon's experts' reports. In his affidavit, Berry claims that "[t]hrough my review of the Defendants' expert reports, in particular the report of Clair Splittstoesser, I became of [*sic*] aware of Defendants' position that subject Dixon Model 5022 lawn tractor would not support a ROPS."[34] As previously noted, however, Splittstoesser made the same representation in his deposition, which Berry reviewed prior to Berry's initial report.

Apparently in response to reviewing the reports of Dixon's experts, Mr. Berry located and purchased a Dixon model 5020. The mower was delivered to Berry either on January 7 or January 11, 2011. Between January 11 and February 11, Berry designed, manufactured, and installed a rollover system and seat belts on the model 5020. According to Berry's affidavit, the installation was completed on February 11, with photographs of the alternative design provided to Bruess' attorney on February 14. Berry conducted rollover tests on February 23, with a report and additional photographs provided to Bruess' attorney on February 28.

The issue before the Court is whether Mr. Berry's design, fabrication, installation, and testing of the rollover protective system on the model 5020 was simply a "supplement" to his prior opinion, disclosed pursuant to FEDERAL RULE OF CIVIL PROCEDURE 26(e), or if it substantially changed Berry's testimony, and its disclosure was untimely. For the

---

[32] *Id.* at 18.

[33] *See* Affidavit of Thomas A. Berry (docket number 33-7) at 2.

[34] *Id.* at 2-3.

reasons which follow, the Court concludes that the proposed testimony regarding Berry's ROPS exemplar was not timely disclosed.

First, it is worth noting that the Scheduling Order "is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril." *Transamerica Life Ins. Co. v. Lincoln Nat. Life Ins. Co.*, 592 F. Supp. 2d 1087, 1093 (N.D. Iowa 2008). Here, the Scheduling Order required Bruess to identify his expert witnesses by October 19, 2010. Pursuant to Rule 26(a)(2)(B), the designation also required submission of a report containing "a complete statement of all opinions the witness will express and the basis and reasons for them." Nearly three months earlier, Mr. Splittstoesser testified at a Rule 30(b)(6) deposition that the frame of the model 5022 "was not conducive to a roll system." While Splittstoesser subsequently agreed that machines "of the same size" would support a rollover protective system, he did not change his testimony that the frame of the model 5022 "would not support a roll system." That is, notwithstanding Mr. Berry's statement in a recent affidavit that he only became aware of Dixon's position that the model 5022 "would not support a ROPS" when he received Splittstoesser's report, Berry's initial report revealed that he had reviewed Splittstoesser's deposition testimony stating the same opinion. Accordingly, Berry was aware of Dixon's "position" on this subject well before Bruess' deadline for disclosing its experts' opinions.

Even if testimony regarding Mr. Berry's design, fabrication, installation, and testing of the rollover protective system on the model 5020 is properly considered rebuttal testimony, however, it is still not timely. Berry purchased the model 5020 on January 3, 2011, and it was delivered on either January 7 or January 11. Berry immediately set about the task of designing a rollover protective system. Nonetheless, Bruess made no effort to contact Dixon regarding the potential for an expanded opinion by Berry. In his "rebuttal letter" to Bruess' attorney, dated January 12, 2011, Berry does not mention the procurement of a similar mower, nor does he refer to an intent to design a rollover protective system. Despite a looming January 18 deadline, Bruess did not file a request

to extend the deadline for disclosing rebuttal experts. *See Trost v. Trek Bicycle Corp.*, 162 F.3d 1004, 1008 (8th Cir. 1998) (If a party has a legitimate need for more time to submit an expert's report, "then his proper course of action would have been to seek an extension of the deadline."). On February 23, 2011, Bruess first disclosed the existence of the ROPS designed and fabricated by Berry. Bruess did not alert Dixon that rollover tests were being conducted by Berry on February 23, 2011.

The Court believes that evidence of the design, fabrication, installation, and testing of the rollover protective system is not merely a "supplement" to Mr. Berry's prior opinions. Rather, it substantially expands Berry's opinions, more than four months after expiration of the deadline for Berry to disclose "a complete statement of all opinions the witness will express and the basis and reasons for them." Rule 26(a)(2)(B)(i). If Bruess believed that designing and building a rollover protective system for a riding lawn mower similar to that involved in this case was necessary or appropriate to bolster Berry's opinion that it was "technically and economically feasible," then he could have done so within the deadlines established by the Scheduling Order. Berry's claim that he only later became aware of Dixon's position that the model 5022 "would not support a ROPS," is unpersuasive.

Evidence regarding Mr. Berry's design, fabrication, installation, and testing of the rollover protective system goes far beyond his initial testimony that a rollover protective system on the model 5022 was "technically and economically feasible." Even if the evidence is proper rebuttal, it should have been disclosed within the time for doing so, or an extension should have been sought. If the Court allows expert witnesses to substantially expand their opinions, and the basis and reasons for them, after the deadlines for doing so have expired, then it substantially undercuts the orderly trial process. Illustrating the point, at his deposition on March 8, 2011, Mr. Berry testified that he had *still* not

completed his testing, indicating that he intended to do so "as soon as I have time."[35] Rule 26(a)(2) is designed to alert the opposing party of the expert opinions against which it must defend. That purpose is frustrated, however, if Bruess is permitted to establish a "moving target" by adding to Berry's opinions and changing the basis and reasons for those opinions.

Bruess' reliance on Rule 26(e), which requires a party to supplement an expert's report "if the party learns that in some material respect the disclosure or response is incomplete or incorrect," is misplaced. Rule 26(e) is not intended as a vehicle to shore up previous opinions.

> A supplemental expert report that states additional opinions or rationales or seeks to "strengthen" or "deepen" opinions expressed in the original expert report exceeds the bounds of permissible supplementation and is subject to exclusion under Rule 37(c)(1). To rule otherwise would create a system where preliminary expert reports could be followed by supplementary reports and there would be no finality to expert reports, as each side, in order to buttress its case or position, could "supplement" existing reports and modify opinions previously given. This result would be the antithesis of the full expert disclosure requirements stated in Rule 26(a).

*Cohlmia v. Ardent Health Services, LLC*, 254 F.R.D. 426, 433 (N.D. Okla. 2008); *Beller v. United States*, 221 F.R.D. 696, 701 (D.N.M. 2003) (same). *See also Keener v. United States*, 181 F.R.D. 639, 640 (D. Mont. 1998) ("Supplementation under the Rules means correcting inaccuracies, or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure."). Since evidence regarding Mr. Berry's design, fabrication, installation, and testing of a rollover protective system for the model 5020 is not properly considered "supplemental" information, the disclosure of the evidence was untimely.

---

[35] *See* Deposition of Thomas Allen Berry (docket number 33-6), 60:24-61:14.

### b. Was Bruess' Failure to Timely Disclose Substantially Justified?

FEDERAL RULE OF CIVIL PROCEDURE 37(c)(1) states that if a party fails to provide information or identify a witness as required by Rule 26(a), then "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." *See also Firefighters' Institute for Racial Equality v. City of St. Louis*, 220 F.3d 898, 902 (8th Cir. 2000) ("Unless the failure to meet a deadline was either harmless or substantially justified, the court may sanction a party by excluding its evidence."); *Crump v. Versa Products, Inc.*, 400 F.3d 1104, 1110 (8th Cir. 2005) (same).

"The Eighth Circuit Court of Appeals has repeatedly held that the failure to disclose an expert report is a failure to disclose under Rule 26." *Benedict v. Zimmer, Inc.*, 232 F.R.D. 305, 315 (N.D. Iowa 2005) (citing *Trost*, 162 F.R.D. at 1008). Accordingly, Bruess is not entitled to use evidence relating to the rollover protective system designed and built by Berry, unless the failure to timely disclose that evidence was substantially justified or is harmless. Bruess has the burden of proof in this regard. *In re Air Crash Near Kirksville, MO.*, 2007 WL 2363505 (E.D. Mo.) at *4.

Bruess argues here that the late disclosure was substantially justified because it was not until after Bruess received the reports of Defendants' experts on December 19, 2010, that Berry acquired a similar mower and designed a rollover protective system for it. Bruess argues that the January 18, 2011, deadline for disclosing rebuttal experts "did not leave enough time for Mr. Berry to locate, order, receive, and construct a certifiable ROPS for the Dixon 5020."[36]

However, as set forth above, Bruess knew not later than Mr. Splittstoesser's deposition on July 28, 2010, that Dixon believed the model 5022 frame "would not support a roll system." Mr. Berry was aware of Splittstoesser's opinion in that regard. Berry could have acquired a similar mower, and designed and constructed a rollover protective

---

[36] *See* Bruess' Response to Motion to Exclude Evidence (docket number 33) at 13.

system, prior to the October 19, 2010 deadline for disclosing Bruess' expert witnesses. Even if the Court accepts the argument that Bruess was not fully advised of Dixon's position in this regard until after he received the reports of Dixon's experts on December 19, 2010, and assuming further that he did not have an adequate opportunity to fully rebut those opinions by January 18, 2011, then it was still incumbent upon Bruess to seek an extension of the deadline for rebuttal experts, rather than simply ignore it. The Court suspects that Bruess wanted to see if Berry would be successful in his efforts to design and build a rollover protective system for the model 5020, before disclosing Berry's intentions in that regard. In any event, the Court concludes that disclosure of Berry's additional opinions more than four months after the deadline for submitting "a complete statement of all opinions the witness will express and the basis and reasons for them," and more than one month after the deadline for disclosing rebuttal experts, was not substantially justified.

### c.     Was Bruess' Failure to Timely Disclose Harmless?

Even though I believe that Bruess' failure to timely disclose Mr. Berry's design, construction, and testing of a rollover protective system was not substantially justified, the additional testimony should nonetheless be permitted if the Court finds that "such failure is harmless." FED. R. CIV. P. 37(c)(1). In arguing that the late disclosure in this case is "procedurally harmless," Bruess repeatedly reminds the Court that "**[h]ere there is not even a trial date set in this matter**."[37] The lack of a trial date does not, however, negate the pretrial deadlines established in the Scheduling Order, as amended. To hold otherwise would render the Scheduling Order meaningless.

The courts have long-recognized the importance of compliance with pretrial orders. "Adherence to progression order deadlines is critical to achieving the primary goal of the judiciary: 'to serve the just, speedy, and inexpensive determination of every action.'" *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir. 2006) (quoting FED. R. CIV. P. 1). Furthermore, "'[t]he power of the trial court to exclude exhibits and

---

[37] *Id.* at 12 (emphasis in original).

witnesses not disclosed in compliance with its discovery and pretrial orders is essential' to the judge's control over the case." *Boardman v. National Medical Enterprises*, 106 F.3d 840, 843 (8th Cir. 1997) (quoting *Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877, 897-98 (8th Cir. 1978)). Nonetheless, "the district court's discretion narrows as the severity of the sanction or remedy it elects increases." *Wegener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008). "[A] trial court should not adhere blindly to the letter of the order 'no matter what the reason' for a party's non-compliance." *Dabney v. Montgomery Ward & Co., Inc.*, 692 F.2d 49, 52 (8th Cir. 1982).

In *Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 284 (8th Cir. 1995), the Court noted that "we have upheld rulings by district courts precluding experts from testifying when those experts were not timely disclosed pursuant to pretrial orders and local rules," citing *Harris v. Steelweld Equip. Co.*, 869 F.2d 396, 399 (8th Cir. 1989) and *Blue v. Rose*, 786 F.2d 349, 351 (8th Cir. 1986). "By logical extension," the Court concluded that the district court did not abuse its discretion by limiting plaintiff's expert's testimony to the content of his original affidavit. *Id.*

Rule 37(c)(1) provides that a party "is not allowed" to use information which failed to comply with Rule 26(a), unless the failure was substantially justified or is harmless. That is, the rule suggests that unless the failure was substantially justified or harmless, then the sanction of disallowing the evidence necessarily follows. However, in *Wegener*, the Court stated that "[t]he district court **may** exclude the information or testimony as a self-executing sanction unless the party's failure to comply is substantially justified or harmless." 527 F.3d at 692 (emphasis added). The Court suggested four factors which should be considered in "fashioning a remedy," noting that "the district court's discretion narrows as the severity of the sanction or remedy it elects increases." *Id.*

> When fashioning a remedy, the district court should consider, *inter alia*, the reason for noncompliance, the surprise and prejudice to the opposing party, the extent to which allowing the information or testimony would disrupt the order and

efficiency of the trial, and the importance of the information or testimony.

*Id.*

As set forth above, the Court finds unpersuasive the reasons given by Bruess for failing to comply with the deadlines established by Court order. Bruess' late disclosure that Mr. Berry had acquired a similar riding lawn mower, and had designed, fabricated, installed, and tested a rollover protective system, presumably "surprised" Dixon and, in my view, resulted in prejudice. The disclosure came less than one month prior to the deadline for completion of discovery, and less than two months prior to the deadline for filing dispositive motions.[38] While Dixon deposed Berry on March 8, 2011, as previously scheduled, and asked him about the rollover protective system designed and built for the model 5020, it was not feasible to complete further discovery on the ROPS exemplar prior to the March 20, 2011 discovery deadline. Permitting testimony regarding the ROPS exemplar will require the reopening of discovery, likely surrebuttal testimony by Dixon's experts, and the impossibility of complying with the Court's August 18, 2011 trial ready date.

In summary, I believe that Bruess' "supplemental disclosures" regarding the acquisition by Mr. Berry of a model 5020, and his subsequent design, fabrication, installation, and testing of a rollover protective system for that mower, do not comply with FEDERAL RULE OF CIVIL PROCEDURE 26(a)(2)(C) and Local Rule 26.b. Furthermore, I believe that Bruess' failure to timely provide the evidence was not substantially justified or harmless. Accordingly, I respectfully recommend that the district court grant Dixon's motion to exclude evidence, and prohibit Bruess from offering any evidence regarding Berry's design, fabrication, installation, or testing of a rollover protective system for the Dixon Model 5020.

---

[38] Dixon filed a Motion for Summary Judgment on April 20, 2011. *See* docket number 41.

## 2.    *Admissibility of Dr. Griffin's Testimony*

Dixon also asserts that Dr. Griffin should be prohibited from testifying. Dixon argues that Griffin's testimony is not true rebuttal evidence and, therefore, was not timely disclosed. On January 18, 2011, the deadline for disclosing rebuttal witnesses, Bruess identified Dr. Griffin as a rebuttal expert. In his report dated January 15, 2011, entitled "The Purchase and Use of Ride-On Lawn Mowers Without Roll-Over Protective Structures: The Roll of Optimistic Bias," Griffin considers "the psychological factors that affect the risk perception of a potential purchaser and/or user of a ride-on lawnmower."[39] Griffin describes the effect of "optimistic bias," which he defines as "a set of psychological tendencies that jointly operate to lead individuals to underestimate the likelihood of negative outcomes and overestimate the likelihood of positive outcomes."[40] Griffin opines that "optimistic bias is an important factor in explaining the willingness of consumers to purchase and use equipment without protective structures."[41]

To test the effect of optimistic bias in the context of purchasing and driving ride-on lawnmowers, Dr. Griffin conducted an online survey. "[A] statistically significant majority of the respondents reported that they were less at risk and more in control than average."[42] Noting that the decedent in this case was an experienced tractor user and bus driver, and had considerable experience with ride-on lawnmowers, Griffin then opines that "he would be likely to see the operation of a ride-on lawnmower as a highly controllable activity and as such he would be in a position to attribute other people's accidents as a

---

[39] *See* January 15, 2011 Report of Dr. Dale Griffin (docket number 28-10) at 1.

[40] *Id.*

[41] *Id.*

[42] *Id.* at 6.

result of a lower level of skill and preparation."[43]   Griffin also asserts that "simple exhortations for good judgment" found in an owner's manual "do not alleviate the general tendency towards the optimistic bias."[44]   In asking that Bruess be prohibited from calling Dr. Griffin as an expert, Dixon asserts that he is not a proper rebuttal witness and should have been designated with Bruess' initial experts.

"As opposed to a case-in-chief expert witness, a rebuttal expert witness is 'an expert witness necessary to refute the disclosed opinions of an opposing party's expert witness.'" *Probatter Sports, LLC v. Joyner Technologies, Inc.*, 2007 WL 2752080 (N.D. Iowa) at *3 (quoting *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 760 (8th Cir. 2006)). Stated otherwise, "the function of rebuttal testimony is to explain, repell, counteract or disprove evidence of the adverse party." *United States v. Lamoreaux*, 422 F.3d 750, 755 (8th Cir. 2005).

Here, Bruess argues that Dr. Griffin's testimony is offered to rebut the testimony of one of Dixon's experts, Clair Splittstoesser. Specifically, Bruess points to the following excerpt from Splittstoesser's report:

> I conducted a brief survey in December, 2010 of all the riding mower models offered by three of the largest retailers of mowers, Sears, Lowe's, and Home Depot. *See* Attachment No. 2. There were a total of 75 mowers offered and only 5, or less than 7 percent, had ROPS as either standard or optional offers. The Dixon Model 5022 without ROPS is very much in line with the riding mowers offered for sale today as well as when it was produced in 1999.

*See* December 17, 2010 report of Clair D. Splittstoesser (docket number 33-3) at 4. According to Bruess, Splittstoesser's survey establishing that riding lawnmowers without

---

[43] *Id.*

[44] *Id.* at 7.

rollover protective systems "sell in great abundance," carries with it the "obvious intimation that they therefore must not be unreasonably dangerous."[45]

Even assuming the admissibility at trial of the results of Mr. Splittstoesser's "survey," and assuming further that the results carry with them an "obvious intimation" that riding lawnmowers sold without a rollover protective system are not unreasonably dangerous, there is no indication that Splittstoesser will testify regarding the psychological reasons why someone would buy a riding lawnmower without a rollover protective system, much less the "risk perception" of buyers of riding lawnmowers. Moreover, there is no indication in the record that Splittstoesser would be qualified to render such an opinion.

Dr. Griffin has a bachelors degree, masters degree, and doctorate in psychology. If permitted to do so, Griffin will testify regarding "the psychological factors that affect the risk perception of a potential purchaser and/or user of a ride-on lawnmower." Specifically, Griffin will testify regarding an "optimistic bias" which leads people to "underestimate the likelihood of negative outcomes and overestimate the likelihood of positive outcomes." While Mr. Splittstoesser will apparently proffer testimony that a large number of riding lawnmowers are sold without a rollover protective system, there is no indication that he will testify regarding "why" consumers purchase riding lawnmowers without a ROPS. Accordingly, Griffin's testimony regarding the "why" does not rebut Splittstoesser's testimony.

Since Dr. Griffin's testimony does not rebut any evidence proffered by Dixon through its experts, it is not true rebuttal evidence and should have been timely disclosed with Bruess' experts for his case-in-chief. *Marmo*, 457 F.3d at 759 ("rebuttal evidence may be used to challenge the evidence or theory of an opponent – and not to establish a case-in-chief"). Bruess was required to disclose his expert witnesses not later than October 19, 2010. Dr. Griffin was not disclosed until January 18, 2011, the deadline for disclosing rebuttal witnesses. In construing the progression order, it is within the Court's discretion

---

[45] *See* Bruess' Response to Motion to Exclude (docket number 33) at 17.

that witnesses disclosed as rebuttal witnesses will not be permitted to testify in a plaintiff's case-in-chief." *Id.* Such a result is necessary to provide for the orderly progression of the case to trial, and to maintain the distinction between primary and rebuttal witnesses. *Id.* ("To construe otherwise would eviscerate the distinction between primary and rebuttal witnesses.").

In summary, since Dr. Griffin's testimony does not rebut any expert opinions proffered by Dixon, he is not properly considered a rebuttal witness. While Bruess could have designated Griffin as one of his primary experts, he failed to do so. Griffin's designation as an expert witness three months later was not timely. Bruess offers no evidence or argument that if Griffin is considered a primary witness, his late disclosure was substantially justified or is otherwise harmless, nor does not Court find any. Since Griffin is not a true rebuttal witness, and since his disclosure as a primary witness would be untimely, I respectfully recommend that he not be permitted to testify at trial.

### B. *Motion to Exclude Expert Evidence Under Daubert*

On April 20, 2011, Dixon filed a motion to exclude the testimony of Bruess' experts – Thomas Berry, Jeffrey Ketchman, and Dale Griffin – pursuant to FED. R. EVID. 104(a) and 702, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Dixon asserts that Berry's and Ketchman's testimony, regarding the lawnmower's alleged defective design and Dixon's alleged inadequate warnings, should be excluded because neither expert's testimony is relevant or reliable under *Daubert*. Dixon also asserts Griffin's opinion should be excluded because it is neither relevant nor reliable.

The admissibility of expert testimony is governed by Federal Rules of Evidence 104(a) and 702, as interpreted by the United States Supreme Court. Rule 104(a) states that "[p]reliminary questions concerning the qualification of a person to be a witness . . . shall be determined by the court. . . [.]" In the context of expert testimony, Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to

> determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. When determining whether an expert may testify, "the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592. This examination applies not only to "scientific knowledge," but also to technical and specialized knowledge. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141. In other words, "trial courts must serve as gatekeepers to insure that proffered expert testimony is both relevant and reliable." *Wagner v. Hesston Corp.*, 450 F.3d 756, 758 (8th Cir. 2006) (citations omitted). The proponent of expert testimony must prove that the testimony is reliable and relevant by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n.10 (citing *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987)).

### 1. Design Defect

Dixon argues Mr. Berry and Dr. Ketchman's opinions regarding the lawnmower's defective design is neither relevant nor reliable, and therefore should be excluded under *Daubert*. The Court will first address Berry's opinions.

### a. Mr. Berry's Opinion Regarding the Mower's Alleged Defective Design

In part **IV.A.1**, the Court concluded that Mr. Berry's testimony regarding the ROPS exemplar is inadmissible because it was untimely disclosed. However, in the event the District Court disagrees with this conclusion, this part will analyze Berry's testimony under *Daubert* with and without the testimony regarding the ROPS exemplar.

### (1) *Admissibility of Opinion Without Evidence of ROPS Exemplar*

In Mr. Berry's initial report, he opines that the Dixon Model 5022 is "defective in design and unreasonably dangerous."[46] He alleges "[t]he manufacturer knew or should have known of technically and economically feasible design alternatives that would have significantly reduced the risk without adversely affecting the utility of the machine."[47] In terms of causation, Berry opines that "ROPS would have prevented Mrs. [sic] Bruess from being fatally or permanently injured due to being caught and drowned under the Dixon 5000 Series."[48] In conclusion, Berry opines:

> The Dixon 5000 Series should have been provided with a rollover protective structure or rollbar and seat belts that would create an operator protective zone in the event of a tipover and/or rollover accident. The cost of providing a ROPS and seatbelt for the Dixon 5000 Series is estimated to be in the range of $100 if the mounting structure is designed into the frame up and up to $150 if not.

*See* October 15, 2010 letter from Thomas A. Berry (docket number 28-2) at 20.

In order for Mr. Berry's expert testimony to be admissible, it needs to be both relevant and reliable. *Daubert*, 509 U.S. at 589. In deciding whether Mr. Berry's testimony is relevant, the trial judge must determine whether the evidence or testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 591 (quoting Federal Rule of Evidence 702). Berry's testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id.* at 591 (citation omitted); *see also Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055 (8th Cir. 2000) (citations omitted). However, "[c]ourts should

---

[46] *See* October 15, 2010 letter from Thomas A. Berry (docket number 28-2) at 19.

[47] *Id.*

[48] *Id.* at 20.

resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Marmo*, 457 F.3d at 758 (citations omitted).

Dixon asserts that Mr. Berry's opinions are not relevant because they are not based on an analysis of the particular mower at issue, but instead are based solely on the conclusion that all mowers over a certain weight without a ROPS are defective. In addition, Dixon argues Berry was not specific in offering opinions regarding an alternative design. Dixon also asserts that Berry said "there is no technical reason as to why a ROPS could not have been supplied . . ." without ever having seen the model in question. Furthermore, Dixon alleges that Berry simply relied on the same opinions in this case as he did in other cases involving riding mowers, without looking at the specific facts of this case. In summary, Dixon argues that Berry's testimony in his initial report was not relevant and thus fails the first prong of *Daubert*.

The Court concludes Mr. Berry's testimony is relevant to this case. Iowa has adopted the Restatement (Third) of Torts' definition of design defect. *Wright v. Brooke Group. Ltd.*, 652 N.W.2d 159, 169 (Iowa 2002). In order to prove a design defect, a plaintiff must show that "[t]he foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe." *Id.* Although Berry has not shown a particular alternative design would work for the model in question,[49] he has "presented evidence that [Dixon] could have, and should have . . . [implemented an alternative design.]" *See Freeman v. Caterpillar Industrial, Inc.*, 2007 WL 1020465 *8 (E.D. Ark. 2007). Berry's opinion includes information about the risks of mowers without ROPS and includes information about whether these risks were foreseeable. Berry also writes of his prior experience of building mowers with a ROPS, and can describe the feasibility of these designs. Berry has a thorough knowledge of the

---

[49] Assuming the ROPS exemplar evidence is excluded.

relevant literature and the various safety standards for lawn mowers. Berry also has previously testified on the issue of ROPS on lawn mowers. While Berry did not study this specific mower in rendering his initial opinion, his testimony is relevant because it is "sufficiently tied to the facts" and would "assist the trier of fact" to determine whether the Dixon ZTR 5022 mower was defectively designed. Although Berry's opinions would be afforded more weight if they were more closely tailored to the subject mower, "[c]ourts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Marmo*, 457 F.3d at 758.

Mr. Berry's testimony must also must satisfy the reliability prong of *Daubert*. "To satisfy the reliability requirement, the proponent of the expert testimony must show by a preponderance of the evidence both that the expert is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid." *Marmo*, 457 F.3d at 757-58 (citing *Daubert*, 509 U.S. at 589-90). Dixon does not question that Berry is qualified, but claims Berry's methodology is unreliable under *Daubert*.

The purpose of the reliability requirement is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. In *Daubert*, the Court identified four factors that are relevant in determining whether an expert's opinions are based on reliable methodology:

> 1) whether the theory or technique used to derive the opinion can be (and has been) tested;
> 2) whether the theory or technique used to derive the opinion has been subjected to peer review or publication;
> 3) whether the theory or technique used to derive the opinion has a known or potential rate of error; and
> 4) whether the theory or technique used to derive the opinion has "general acceptance" in the relevant community.

*Daubert*, 509 U.S. at 593-94. The trial court *may* consider one or more of these factors, but *Daubert's* list is not exclusive nor does each factor apply in every case. *See Kumho*,

526 U.S. at 141. The Eighth Circuit Court of Appeals has added other factors to the inquiry of reliability:

> 1) whether the opinion is developed for litigation or is based on research conducted independent of litigation; and
> 2) whether an expert can rule out alternative explanations.

*See Lauzon v. Senco Products, Inc.*, 270 F.3d 681, 687 (8th Cir. 2001). Overall, the test of reliability is "flexible," and "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho*, 526 at 152.

The first, and perhaps most important, factor in a design defect case is whether or not the theory has been tested. *See Dancy v. Hyster Co.*, 127 F.3d 649, 651-52 (8th Cir. 1997) (reciting all the *Daubert* factors and only applying the "testing" factor). Bruess argues that testing is irrelevant because Dixon's own design engineer, Mr. Splittstoesser, testified that an alternative design is possible. Even if this is the proper interpretation of Splittstoesser's testimony,[50] this admission does nothing to support the reliability of Mr. Berry's expert testimony. The burden is on Bruess to prove by a preponderance of evidence that Berry's testimony is reliable. *Daubert*, 509 U.S. at 592 n.10 (citation omitted).

In reaching his initial opinions, Berry had not designed, tested, or certified a ROPS on this particular model. Furthermore, there is no evidence that he has designed, tested, or certified a ROPS for ZTR mowers of this particular size.[51] However, Berry has done extensive testing of ROPS on various mowers throughout his career, both for manufacturers and for litigation purposes. The Eighth Circuit cases "do not require that experts manufacture a new device or prototype in order for their opinion to be admitted."

---

[50] As noted in part **IV.A.1.a.**, the Court does not agree with Bruess' interpretation of Mr. Splittstoesser's testimony.

[51] *See* Deposition of Thomas A. Berry (docket number 41-4) at 87-88 (Dep. 42:15 - 45:14).

*Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1012 (8th Cir. 2005). Rather, "an expert proposing safety modifications must demonstrate by some means that they would work to protect the machine operators but would not interfere with the machine's utility." *Id.* The Court is satisfied that Berry's previous experience designing, testing, and certifying ROPS for other mowers sufficiently validates Berry's opinion that a ROPS on this mower could protect the machine operator and would not interfere with the machine's utility, even though he did not conduct testing on this machine. Therefore, Berry's testimony meets the first factor of *Daubert*.

The second factor is whether the theory used to derive an expert's opinion has been subjected to peer review. Neither Bruess nor Dixon directly addresses this *Daubert* factor, but the Court pauses to discuss it. Peer review is not required for admissibility, but "submission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected." *Peitzmeier v. Hennessy Indus. Inc.*, 97 F.3d 293, 297 (8th Cir. 1996) (quoting *Daubert*, 509 U.S. at 593). Bruess' resistance directs the Court to two articles Berry authored on the need for ROPS in small lawn tractors, neither of which have been subject to peer review. The Court also notes that Berry was unaware of any study done on the effectiveness of ROPS for mowers under 850 pounds that could support his opinion in this case.[52] Aside from the two documents that Berry published (one of which appears to be prepared for this litigation), Bruess does not present any evidence supporting Berry's theory that this particular mower was designed defectively because it did not have a ROPS. Although Berry has testified at many trials, the cross-examination of Berry at multiple trials cannot take the place of scientific peer review. *See Peitzmeier*, 97 F.3d at 297. Overall, Berry's theory about this mower's defective design is not supported by peer review and this detracts from the reliability of his opinion.

---

[52] *See* Deposition of Thomas A. Berry (docket number 41-4) at 86-87 (Dep. 39:11 - 42:14).

The third factor looks at the rate of error of the theory or technique. Neither Dixon nor Bruess have briefed this issue and the Court does not believe this factor is relevant. The *Daubert* reliability factors should only be relied upon to the extent they are relevant. *See Pestel v. Vermeer Mfg. Co.*, 64 F.3d 382, 384 (8th Cir. 1995).

The fourth factor considers whether the theory or technique has a "general acceptance" in the relevant community. *Daubert*, 509 U.S. at 594. "Widespread acceptance can be an important factor in ruling particular evidence admissible, and 'a known technique which has been able to attract only minimal support within the community' may properly be viewed with skepticism." *Id.* at 594 (internal citation omitted). The parties substantially disagree on whether or not Mr. Berry's theory about rollover protection systems has gained a general acceptance in the relevant community.[53] Bruess asserts that ROPS have been placed on more safety-minded manufacturers' tractors since the 1970s, and that at least nineteen competitors have put them on ZTR mowers of 850 pounds or less. In contrast, Dixon points out that Berry agreed that the "vast majority" of ZTR mowers under 850 pounds were not equipped with ROPS in 1999. In *Wagner v. Hesston Corp.*, 450 F.3d 756, 759 (8th Cir. 2006), the Eighth Circuit Court of Appeals looked at industry standards in measuring "general acceptance," by noting "the lack of evidence showing general acceptance in the industry of safety guards for large balers[.]" *Id.* at 759.

In this case, the most relevant community is manufacturers of riding lawnmowers of similar size (850 pounds or less) during 1999. Plaintiff's Exhibit 6014 shows that only two of the current nineteen manufacturers had manufactured ROPS for their mowers of 850 pounds or less at that time. In fact, these manufacturers only had ROPS as optional

---

[53] *Compare* Defendant's Brief (docket number 39-1) at 18, and Defendant's Reply (docket number 58) at 3, with Plaintiff's Resistance (docket number 50-2) at 8, 13, 14.

equipment.[54]  Furthermore, the industry standard at the time did not require ROPS for ZTR mowers.[55]  The fact that the evidence on the record shows that only two manufacturers of ZTR mowers of this size included ROPS as even optional equipment establishes that Berry's testimony falls short of meeting the "general acceptance" standard articulated in *Daubert*.  Therefore, Berry's failure to establish this factor detracts from the reliability of his testimony.

The Eighth Circuit Court of Appeals has also held that an opinion that is based on research conducted independent of litigation is more reliable than one that has been developed for litigation. *Lauzon*, 270 F.3d at 687.  Independent research is more reliable because it is less likely to be biased and the expert is limited to "the degree to which he can tailor his testimony to serve a party's interests." *Id.* at 692 (quoting *Daubert*, 43 F.3d 1311, 1317 (9th Cir. 1995)).  Regarding this factor, the Court may consider whether the expert was introduced to the field through litigation, *Lauzon*, 270 F.3d at 692-93, and may also consider whether alternative designs were built in connection with litigation. *See Wagner*, 450 F.3d at 759.  At Mr. Berry's deposition, he testified that he was hired out of college to begin working with an engineering company and spent 40-80% of his time on litigation matters.  Since 2005, Berry has devoted 60-70% of his time to being an expert witness in lawsuits and he derives 100% of his working income from serving as an expert witness.  Berry estimates he has been hired by Bruess's attorney, Mr. Gehlhausen, seven or eight times and has previously testified about ZTR lawn mowers.  Furthermore, Berry's article entitled "Stability Related Accidents Involving Ride-on Mowers" was published after litigation began.  On the other hand, Berry has designed, tested, and certified mowers throughout his professional career for manufacturers as well.  The Court concludes that this factor weighs against the reliability of Berry's testimony.

---

[54] *See* Plaintiff's Exhibit 6014 (docket number 53-5) at 589.

[55] *See* October 15, 2010 letter from Thomas A. Berry (docket number 28-2) at 18.

Another factor the Eighth Circuit Court of Appeals has adopted is whether the expert has ruled out alternative ways the harm may have occurred. *Lauzon*, 270 F.3d at 693. In order to satisfy this factor, the plaintiff "need only be able to explain why other causes are excludable." *Id.* at 694. Although it is possible that the accident occurred because the decedent was incapacitated, the proper consideration is whether Mr. Berry has ruled out other possible alternatives that could have caused the harm once the accident *did* occur. In this case, Berry's opinion suggests a ROPS may have altered the outcome of the accident, and the issue is whether this mower was defectively designed because it did not include a ROPS. The Court concludes that Berry has met the requirements of this factor.

After considering the various factors, the Court concludes that Bruess has met his burden of proving by a preponderance of the evidence that Mr. Berry's expert testimony is relevant and reliable. The Court bears in mind that the test of reliability is "flexible," and that "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho*, 526 at 152. In this case, the Court acknowledges some of the weaknesses of Berry's testimony, but puts significant weight on his many years of designing, testing, and certifying ROPS on other mowers. The Court concludes that Berry's ample experience in the field gives him the specialized and technical knowledge to reliably testify about this mower's alleged design defect. "Vigorous cross-examination, presentation of the contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

> **(2)    *Admissibility of Mr. Berry's Opinion with Evidence of ROPS Exemplar Included*[56]**

In Bruess' supplemental disclosure, he provided four photographs of a Dixon model 5020 complete with a rollover protective system that Mr. Berry had constructed. Bruess

---

[56] This section is only relevant if the district court disagrees with the undersigned's opinion that the ROPS exemplar was untimely (Part **IV.A.1)** and, instead, concludes that Mr. Berry will be permitted to testify regarding the ROPS exemplar.

also provided a 2-page "Rollover Test Report for the Dixon 5020 ZTR ROPS," together with 18 additional photographs. The report and photographs describe one lateral and one rearward test performed by Berry on February 23, 2011, using a Dixon 5020 equipped with a ROPS designed and fabricated by him. According to Berry, "[t]he ROPS capably withstood the lateral and rearward rollovers, provided a crush protective zone for the operator and will minimize the likelihood of a complete overturn while providing crush protection to an operator should the tractor/mower roll over onto its top."[57]

Dixon challenges the ROPS exemplar on the grounds of relevance and reliability. In terms of relevance, Dixon asserts that Mr. Berry's ROPS exemplar is irrelevant to the issue of an alleged design defect because the exemplar was in the form of a retrofit design. Dixon correctly points out that there is no duty to retrofit under Iowa law. *See Ahlberg v. Chrysler Corp.*, 481 F.3d 630, 633 (8th Cir. 2007) ("There is no independent duty to retrofit under Iowa law. Since no duty to retrofit exists, the plaintiffs cannot sustain a claim for the breach of this duty."). However, the retrofit exemplar was not intended to prove that Dixon could have or should have retrofitted the subject mower with a ROPS. Rather, the purpose of the ROPS exemplar was to show that it was feasible to install ROPS without abandoning the design of the ZTR 5022 lawn mower. In *Ahlberg*, the plaintiff argued that the judge erred in excluding evidence of a retrofit program undertaken by the manufacturer of a car company. *Ahlberg*, 481 F.3d at 632. The appellate court affirmed the magistrate's decision to exclude this evidence because there was "no independent duty to retrofit," but also because the retrofit evidence "was . . . irrelevant to prove feasibility, as [the car company] conceded it was feasible to install [the device]; thus, feasibility was not an issue at trial." *Id.* at 633. In this case, Dixon has not conceded it was feasible to install a ROPS on the subject lawn mower.[58] Therefore, feasibility is an issue at trial and

---

[57] *See* Plaintiff's 2/28/11 Supplemental Disclosures (docket number 28-13) at 6.

[58] *See* Part **IV.A.1.a-c.**

34

the ROPS exemplar is relevant because it will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 591 (citation omitted).

Dixon also asserts the ROPS exemplar testing is unreliable because 1) Mr. Berry did not certify the ROPS, 2) Berry did not perform stability testing, 3) Berry did not perform endurance testing, and 4) the testing site was dissimilar to the accident site. Rather than analyzing the testing of the ROPS exemplar under all the *Daubert* factors, the Court will analyze the reliability of the testing itself, considered as part of Berry's testimony as a whole. *See Fireman's Fund Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1058 (8th Cir. 2005) (evaluating the substance of testing).

First, Dixon complains the ROPS exemplar had not been certified. At the time of Mr. Berry's deposition on March 8, 2011, Berry testified that he had not yet certified the ROPS on the 5020 lawn mower,[59] but that he "never had [a ROPS] not pass certification."[60] Berry also testified that he had not yet tested the seat belt to see if it meets the applicable standards. Although Berry had not certified the ROPS at the time of his deposition, the Court concludes the absence of certification does not negate the reliability of his testing. Berry later certified the ROPS and the reliability of his opinion is boosted because Berry has designed, tested, and certified ROPS on multiple occasions in the past and testified that all of his ROPS had passed certification.

Second, Dixon asserts that Mr. Berry did not conduct stability tests. Bruess attempts to deflect this concern by stating that the industry stability standards have been criticized by the Consumer Product Safety Commission because the standards "were not adequate to reduce riding mower dynamic stability related deaths and serious injuries."[61] Bruess' reasoning in this regard is illogical. Essentially, Bruess argues that since the

---

[59] Only later, on April 5, 2011, did Mr. Berry confirm the ROPS met the industry standards. *See* Plaintiff's Exhibit 1406 (docket number 41-5) at 134.

[60] *See* Deposition of Thomas A. Berry (docket number 41-4) at 92 (Dep. 61:2 - 12).

[61] *See* October 15, 2010 letter from Thomas A. Berry (docket number 28-2) at 4.

industry standards of stability were too low, Berry did not need to conduct any stability tests. Although the industry standards may be too low, they certainly provide more protection regarding the stability of a lawnmower than not testing at all. Bruess also argues that the purpose of the ROPS exemplar was not to prove stability, but to demonstrate that the subject lawnmower could feasibly have a ROPS without abandoning its design. However, without a showing of any measure of stability of the lawnmower, Berry's tests supporting the conclusion that an alternative design is feasible is less reliable.

Third, Dixon asserts that Mr. Berry did not conduct endurance tests. Herman Christopherson – one of Dixon's experts – testified at his deposition that "[t]he only written criteria is the certification of ROPS, but manufacturers go well beyond that. They need to make it acceptable, durable. . .[.]"[62] Bruess contends that endurance testing is not part of testing protocol because most manufacturers recommend replacing the ROPS if it has experienced a rollover. Given this testimony, the Court concludes that the lack of endurance testing does not detract from the reliability of Berry's testing in any meaningful way.

Fourth, Dixon asserts that the testing was not reliable because it was done on a site that differed from the site of the accident. Dixon points out that the testing site had "no rocks as obstacles, no water at the bottom of the slope, and no gentle slope leading up to the deep slope."[63] Dixon also alleges the speed and angle of the test rollover differed from the actual rollover, making the test rollover less reliable. In deciding whether the testing site was reliable, the Court notes that it "may properly admit experimental evidence if the tests were conducted under conditions substantially similar to the actual conditions. Admissibility, however, does not depend on perfect identity between actual and experimental conditions." *McKnight v. Johnson Controls, Inc.*, 36 F.3d 1396, 1401

---

[62] *See* Deposition of Herman P. Christopherson (docket number 41-6) at 283 (Dep. 72:5-8).

[63] *See* Plaintiff's Brief (docket number 39-1) at 23.

(8th Cir. 1994) (citations omitted). Furthermore, "[when] experimental tests do not purport to recreate the accident, but instead the experiments are used to demonstrate only general scientific principles, the requirement of substantially similar circumstances no longer applies." *Id.* (citing *Champeau v. Fruehauf Corp.*, F.2d 1271, 1278 (8th Cir. 1987)). In this case, the only similarity in the accident site and the test site is that in both cases the accident took place on a slanted slope. However, Mr. Berry was not purporting to recreate the accident, but only to demonstrate that a functional ROPS could be installed on the subject mower without an abandonment of the design. Therefore, the requirement of substantially similar circumstances is not applicable, and the differences in the sites do not detract from the reliability of Berry's rollover tests.

After considering Dixon's claims, the Court concludes that Mr. Berry's ROPS exemplar tests are relevant and reliable. These tests bolster the "testing" factor of Berry's expert opinion and supports the overall reliability of Berry's testimony regarding the lawnmower's defective design.

### b. Dr. Ketchman's Opinion Regarding the Mower's Alleged Defective Design

In Dr. Ketchman's initial report, he opines that the Dixon Model 5022 is "defective and unreasonably dangerous in design because it lacked ROPS as standard equipment – a protective safety device, which was well known to tractor/mower manufacturers before the machine was sold, and which was used by numerous competitors of the Defendants."[64] Ketchman also opines that "[f]urnishing a properly designed fixed, or foldable ROPS for the 5022, was technically and economically feasible when the subject TM was designed/manufactured."[65] Ketchman goes on to say that "[h]ad the subject TM been equipped with a ROPS, it is highly probable that it would have prevented the drowning

---

[64] *See* October 12, 2010 letter from Jeffrey Ketchman (docket number 28-3) at 15.

[65] *Id.*

37

fatality that occurred, by limiting the roll to approximately a quarter-roll, which would not have pinned Mr. Bruess."[66]

As with Mr. Berry, Dr. Ketchman's testimony needs to be relevant and reliable in order to be admissible. *Daubert*, 509 U.S. at 589. In terms of relevance, Ketchman's testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id.* at 591 (citation omitted). However, "[c]ourts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Marmo*, 457 F.3d at 758 (citations omitted).

Dixon's complaints about the relevance of Dr. Ketchman's opinions are similar to those asserted about Mr. Berry's opinions. Dixon asserts that since Ketchman had never operated a Dixon Model 5022, had only seen the model in photographs, reached his opinions without considering the specifics of the model in question, and generally concluded that this model was defective because all models of mowers above a certain weight without a ROPS are defective, his opinions are not relevant. Furthermore, Dixon points out that Ketchman did not know the specifics of what an alternative design might entail.

The Court concludes Dr. Ketchman's testimony is not relevant to this case. While Ketchman would opine that the absence of a rollover protection system makes lawnmowers more dangerous, his testimony is not sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute. *See Daubert*, 509 U.S. at 591. Although neither Mr. Berry nor Ketchman have shown a particular design would work for the model in question, Berry's experience with designing, testing, and certifying ROPS on mowers in the past makes his testimony on the alleged design defect of this particular mower more relevant in assisting the jury to determine whether this particular mower is defective. Unlike Berry, Ketchman has never designed a riding lawn mower. The following

---

[66] *Id.*

exchange illustrates the lack of relevance regarding Ketchman's testimony on the alleged design defects of this particular mower.

Q: And you have never designed a riding lawn mower?

A: I don't think there's any one person who has.

Q: But you have never had any--

A: It's done by a team.

Q: . . . But you have never had any part designing a riding lawn mower?

A: Not from scratch, no.

Q: Well what does that mean?

A: I have had inputs, as I said, by virtue of my consulting with the AMF division that did this, in terms of, you know, design and placement of controls. I can't say that I did any design, though.

Q: You have never designed a zero-turn mower?

A: That is correct.

Q: So have you ever designed a rollover protection system for a mower?

A: No.

*See* Deposition of Jeffrey Ketchman (docket 41-5), 75:6-76:4. While the opinions of Berry and Ketchman are similar, the Court concludes that Ketchman's lack of any design experience makes his opinions regarding alleged design defects in this case irrelevant.

Even if Dr. Ketchman's opinions regarding an alleged design defect were relevant, they are not reliable. To establish reliability, "the proponent of expert testimony must show by a preponderance of the evidence both that the expert is qualified to render the opinion and that the methodology underlying the conclusions is scientifically valid." *Marmo*, 457 F.3d at 757-58 (citing *Daubert*, 509 U.S. at 589090). Regarding the expert's

qualifications, Ketchman has never designed a ZTR mower nor has he designed a ROPS. This utter lack of experience renders him unqualified to testify that this particular ZTR mower was defectively designed. Regarding the reliability of the testimony itself, like Mr. Berry's opinions, Ketchman's opinions have not been subjected to peer review, did not have "general acceptance" in the industry at the time Dixon designed the mower, and were prepared for litigation. But unlike Berry, Ketchman has not done any testing, designing, or certifying of a ROPS for this model *or any other model.*

Since Dr. Ketchman's testimony regarding an alleged design defect is neither relevant nor reliable, the Court respectfully recommends that his testimony be excluded.

### 2. *Inadequate Warnings*

Dixon asserts that all three experts' opinions regarding inadequate warnings are inadmissible. From the complaint and the motions, it is unclear which warnings Bruess alleges are inadequate. In his complaint, Bruess alleges that "[t]he lawn tractor was also unreasonably dangerous because of inadequate warnings including, but not limited to, the failure to adequately warn dealers, buyers, and users of the need for a safety frame on the lawn tractor."[67] In Dixon's brief in support of its motion to exclude the experts' opinions under *Daubert*, it argues that opinions regarding the "two sources for a warnings claim" are irrelevant because there is "no evidence Mr. Bruess had [read] the operator's manual" and because there is "no evidence as to whether decals placed at the time of sale were still on the mower[.] . . ."[68] In his resistance, Bruess stated that the "[p]laintiff is not complaining about necessarily the manual or the decals but as noted in the Berry report, the pre-sale literature should have warned that if the mower was going to be used in situations covered by OSHA it was required by federal law to have a ROPS."[69] Despite

---

[67] *See* Plaintiff's Amended Complaint (docket number 3) at 7.

[68] *See* Defendant's Brief (docket number 39-1) at 25-26.

[69] *See* Plaintiff's Resistance (docket number 50-2) at 24; *see also* October 15, 2010
(continued...)

Bruess' contention he is not "necessarily" complaining about the manual or decals, both Ketchman and Griffin reference the manual and decals in their reports.

In order for the experts' opinions regarding warnings to be admissible, they need to be relevant and reliable. *Daubert*, 509 U.S. at 589. The Court notes that "under Iowa law, the duty to warn requires *adequate* warning, and the adequacy of the warning depends both upon its content and whether the person under the duty took reasonable care to inform the user of the possible danger of the product." *Rowson v. Kawasaki Heavy Industries, Ltd.*, 866 F. Supp. 1221, 1232 (N.D. Iowa 1994) (summarizing Iowa law as articulated by Iowa Supreme Court). However, "an issue as to the adequacy of a warning necessarily presupposes that the operator has read the warning." *Johnson v. Niagara Machine & Tool Works*, 666 F.2d 1223, 1225 (8th Cir. 1981).

### a. *Dixon's Contention that there is No Evidence Bruess Read the Warnings*

In seeking to exclude the experts' opinions regarding the operator's manual or decals, Dixon first argues, citing *Johnson*, that the lack of evidence indicating the decedent read the warnings breaks the chain of causation between the alleged inadequate warnings and the injury. Therefore, Dixon argues, the experts' opinions regarding the warnings in the manual and on the decals are irrelevant. However, this case is not like *Johnson* or any other case cited by Dixon. In *Johnson*, the Eighth Circuit upheld the district court's finding that the plaintiff had not read the warnings. *Id.* at 1225. The district court's finding was based on the plaintiff's own testimony indicating he had not read the warnings. *Id.* Similarly, in *Jaurequi v. Carter Mfg. Co.*, 173 F.3d 1076, 1084 (8th Cir. 1999), the Court held that since the alleged inadequate warnings on a machine were indisputably painted over two times, "the alleged inadequacies of the content of these warning cannot be considered a cause in fact of [the plaintiff's] injuries." *Id.* at 1084.

---

[69](...continued)
letter from Thomas A. Berry (docket number 28-2) at 20.

In this case, however, Dixon has not presented any evidence indicating Bruess did not read either warning, as was the case in *Johnson* and *Jaurequi*. Dixon points to the testimony of Berry, Ketchman, and Bruess' son, indicating that they were all unsure if the decedent had read the warnings. However, these concessions do not demonstrate that Bruess in fact had not seen or read either of the warnings. Dixon's contention, that a lack of evidence indicating the decedent had read the warnings makes expert testimony regarding the adequacy of warnings inadmissible, would essentially assure that expert testimony is per se inadmissible in wrongful death cases. When people read warnings there is seldom any evidence indicating they had read the warning, and whatever testimony may be possible usually is lost upon the person's death. Accepting Dixon's argument could lead to a manufacturer being liable to a paraplegic for a defective warning, but not liable to a decedent's estate on the same grounds, even though both had read the warning. Since neither Dixon nor Bruess has conclusively shown whether the decedent read the warnings in the operator's manual or on the decals, the Court concludes that the experts' opinions on these warnings should not be excluded as irrelevant *on the basis that the deceased did not read the warnings*. The uncertainty regarding whether Bruess read the warnings is an issue to be resolved by the fact finder at trial, not grounds for excluding expert testimony regarding warnings.

### *b.*    *Admissibility of Opinions Regarding Adequacy of Warnings*

With regard to the pre-sale literature, Mr. Berry asserts that the literature should have warned that federal law required the mower to have a ROPS if it were used in situations covered by OSHA. Under this theory, Bruess argues that "such a warning may have prevented its initial purchase that led ultimately to the [owner's] purchase and the use by Mr. Bruess."[70] Although this line of causation is speculative, it does not fail under the relevance prong of *Daubert*. The Court concludes that Berry's opinion regarding federal

---

[70] *See* Plaintiff's Resistance (docket number 50-2) at 24.

law, OSHA, and the warning is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591.

The warning opinions also must be reliable. *See Daubert*, 509 U.S. at 589. Dixon asserts that neither Mr. Berry, Dr. Ketchman, nor Mr. Griffin's opinions are reliable because none of them are qualified to render opinions regarding warnings. *See Marmo*, 457 F.3d at 757-758.

Dixon alleges Mr. Berry is not qualified to testify about warnings because his experience in designing warnings has been for litigation and because he has never written a manual for a ZTR mower. However, Berry testified at his deposition that he designed warnings for manufacturers regarding ROPS, and stated in his affidavit that he had "designed and researched warnings and instructions for tractors that have ROPS as well as warnings on the ROPS that were manufactured by FEMCO, a commercial manufacturer of ROPS for lawn tractor mowers."[71] Given Berry's past experience in designing and researching warnings and instructions for tractors that have ROPS, the Court concludes that Berry is qualified to testify about warnings.

Dr. Ketchman, in contrast, has never written any warnings for lawnmowers. Ketchman states he has "designed warnings to be used in manuals for mechanical equipment, as well as ski bindings. . . ." and that he has "designed warnings for military, industrial, and consumer products."[72] However, at Ketchman's deposition he testified to the following:

> Q:   And am I correct in saying that you have never designed a warning for a lawn mower decal?
>
> A:   Yes.
>
> Q:   Am I correct in saying that you have never written a manual or any part of a manual for a zero-turn mower?

---

[71] *See* Thomas A. Berry's Affidavit (docket number 50-3) at 9.

[72] *See* Jeffrey Ketchman's Affidavit (docket number 50-3) at 80.

A:     That is correct.

*See* Deposition of Jeffery Ketchman (docket 41-5), 74:22-75:5.

In *Robertson v. Norton Co.*, 148 F.3d 905, 907 (8th Cir. 1998), the court held that the expert was not qualified to testify regarding warnings because "[h]e had never designed a warning for a ceramic product." *Id.* at 907. Similarly in *Jaurequi*, the Eighth Circuit Court of Appeals affirmed the exclusion of experts because "neither . . . had created or even designed a warning device which would have been more appropriate, much less tested its effectiveness." *Jaurequi*, 173 F.3d at 1984. Since Ketchman has not designed a warning for a lawn mower or a ROPS, he has not demonstrated the qualifications necessary to testify on any issue regarding warnings for lawnmowers.

With regard to Dr. Griffin,[73] Bruess asserts that his report is intended to rebut an inference in Mr. Splittstoesser's testimony that lawnmowers without a ROPS are not defective because the public buys these machines despite the apparent danger. Griffin's report uses an internet survey and a review of the literature in an attempt to explain why consumers might purchase lawnmowers without a ROPS despite the danger. In Griffin's report, he considers the manual and notes that while it contains an "overwhelming coverage of hazards associated with use of the mower . . . the safety instructions do not draw attention to the possibility of an error, a mistake, or a simple accident that could lead to a roll-over."[74] He also notes that the manual does not recognize or consider the "limitations of human memory in recalling the specific and detailed warnings provided in the manual."[75]

---

[73] This section is only relevant if the District Court disagrees with the undersigned's opinion that Dr. Griffin's testimony is inadmissible as articulated in Part **IV.A.2**.

[74] *See* January 15, 2011 Letter form Dale Griffin (docket number 41-6) at 222.

[75] *Id.*

To the extent Dr. Griffin will testify to the adequacy of the warnings in the manual, he is not qualified. Griffin has no experience designing or writing warnings for manuals of machinery, much less for ZTR mowers or rollover protection systems. Although he has developed warnings for food products and warnings related to environmental issues, this does not qualify him to opine on whether or not the warnings for the subject mower were defective.

In terms of Dr. Griffin's alleged rebuttal opinion of why people might still buy the mower despite its danger, the Court examines its relevance and reliability. *See Daubert*, 509 U.S. at 589. Griffin has demonstrated this opinion is relevant because he has reviewed the theory behind "optimistic bias" and has tied the theory to the particular product at issue through his internet survey. In terms of reliability, Dr. Griffin's opinions are more suspect. Although Griffin has tested whether people would exhibit an "optimistic bias" when buying a lawnmower, he has not subjected this particular test to peer review, nor does he present any evidence that his opinion regarding lawnmowers and "optimistic bias" is "generally accepted" in academia. Additionally, Griffin's internet survey was prepared for litigation, which detracts from its reliability. However, the Court notes that the test of reliability is "flexible," and "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho*, 526 at 152. In considering all the factors, as well as the credentials of Dr. Griffin, I respectfully recommend that if the District Court finds Dr. Griffin's testimony is truly rebuttal evidence, then he be allowed to testify regarding "optimistic bias." Once again the Court notes that "vigorous cross-examination, presentation of the contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

In summary, the Court concludes that Mr. Berry's testimony regarding warnings is relevant and reliable and respectfully recommends that Berry be allowed to testify. Dr. Ketchman's testimony regarding warnings is relevant, but it is not reliable because he is unqualified in this area and the Court respectfully recommends that Ketchman's testimony be excluded. Dr. Griffin's testimony regarding an "optimistic bias" is relevant and reliable and, *if* the District Court finds that it rebuts expert testimony offered by Dixon, then the Court respectfully recommends Griffin be allowed to testify. However, the Court concludes that Griffin is not qualified to testify about any issues relating to warnings.

## V. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that Defendants' Motion to Exclude Evidence on a ROPS Exemplar and Expert Griffin as Untimely (docket number 28) be **GRANTED**. That is, I recommend that Plaintiff's expert Thomas A. Berry be prohibited from testifying regarding his acquisition of a model 5020, and his subsequent design, fabrication, installation, and testing of a rollover protective system for that mower. Furthermore, I do not believe that the testimony proffered by Plaintiff's expert Dale Griffin is truly rebuttal evidence and, therefore, I believe he should be prohibited from testifying.

I further recommend that Defendants' Motion to Exclude Expert Evidence Under *Daubert* (docket number 39) be **GRANTED** in part and **DENIED** in part as follows: Mr. Berry should be permitted to testify regarding those opinions disclosed in his initial and rebuttal reports, including the alleged design defect and inadequate warnings. However, I believe that Plaintiff's expert Jeffrey Ketchman should be prohibited from rendering expert opinions on these issues. Finally, *if* the district court finds that Dale Griffin's testimony rebuts expert testimony offered by Defendants, then I believe he should be permitted to testify as set forth in his report.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court.

DATED this ___8th___ day of July, 2011.

JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA